[No. 25899. *En Banc.* July 7, 1936.]

THE STATE OF WASHINGTON, *on the Relation of Mil-waukee Grain Elevator Company, Respondent,* v. WALTER J. ROBINSON, *as State Director of Agriculture, et al., Appellants.*[1]

*The Attorney General, George Downer,* and *Geo. G. Hannan, Assistants,* for appellants.

*Venable, Graham & Howe,* for respondent.

GERAGHTY, J.—This is an appeal from a judgment directing the issue of a peremptory writ of mandate requiring the appellants, Walter J. Robinson and G. W. Hamilton, director of agriculture and *Attorney*

[1] Reported in 59 P. (2d) 365.

*General,* respectively, to approve a warehouseman's bond, tendered by the respondent in compliance with the provisions of Rem. Rev. Stat., § 6996, as amended by chapter 186, Laws of 1933, p. 815, § 1 (Rem. 1935 Sup., § 6996 [P. C. § 2659]).

The respondent, Milwaukee Grain Elevator Company, operates numerous warehouses in the wheat-growing areas of Washington for the storage of grain and issues warehouse receipts therefor, as provided in the warehousemen's act, Rem. Rev. Stat., §§ 6978 to 7015. All of the capital stock of the Milwaukee Grain Elevator Company is owned by the Gallatin Valley Milling Company, organized under the laws of the state of Washington, but operating a system of warehouses in Montana. The Fisher Flouring Mills Company, a Washington corporation, is organized to carry on the milling business. The intercorporate relation of the Milwaukee, Gallatin and Fisher companies, as set forth in the complaint, is:

"That the Fisher Flouring Mills Company does not own any stock in the Milwaukee Grain Elevator Company, nor does it own any stock in the Gallatin Valley Milling Company, but that all of the stock of the said Gallatin Valley Milling Company was subscribed for and issued to the shareholders of the Fisher Flouring Mills Company in direct proportion to the number of shares in Fisher Flouring Mills Company owned by each stockholder in that company. That a contract was executed by each stockholder in each company stating, in substance, that it is expedient and advisable that the business of the Fisher Flouring Mills Company, the White-Dulany Company and the Gallatin Valley Milling Company be carried on by having a unity of stock and interest in the said three corporations; that therefore there shall be a unity of ownership of the capital stock of the said three corporations by which the ownership of said stock shall be united so that one owner of each share of stock of the Fisher Flouring Mills Company shall also own one-twelfth

of one share of stock of The White-Dulany Company and shall also own one-fourth of one share of stock of the Gallatin Valley Milling Company. That the stock certificate of the Fisher Flouring Mills Company contains an inscription on the back thereof, stating:

" 'The ownership of the shares of stock in the three respective corporations embraced in this certificate shall remain united and inseparable in the proportion of one share in the Fisher Flouring Mills Company to one-twelfth of one share in the White-Dulany Company and one-fourth of one share in the Gallatin Valley Milling Company,'
and contains a condition:

" 'That no part of the stock interest, as evidenced by the within certificate, in any one of the three corporations shall be sold or transferred otherwise than upon assignment and transfer of the same proportionate interest of the stock in each of the other two corporations as shown above; and that no transfer of any shares of stock in any of the said corporations shall be complete until the transfers are made upon the records of each of said corporations for the proportionate shares of stock in the three corporations as hereinabove specified, and shall be evidenced by inseparable certificates in like form as the within and executed by the officers of each corporation; and the foregoing agreement is binding upon the holders of the within instrument, his successors, executors and assigns, and shall be otherwise inalienable.' "

Rem. 1935 Sup., § 6996 [P. C. § 2659], provides:

"Each person, firm, corporation or association of persons operating any public warehouse subject to the provisions of this act shall, on or before the first day of July of each year, give a bond to the state of Washington, with surety to be approved by the director of agriculture in a sum equal to five cents per bushel of the grain capacity of any such warehouse, as may be determined by the director of agriculture, but in no case less than the sum of five thousand dollars

($5,000), to be approved by the director of agriculture and the attorney general. . . ."

conditioned as further in the section provided. The act provides that any person or corporation conducting two or more warehouses may give a single bond meeting its requirements, and a formula is provided for determining the amount of the bond.

The Milwaukee Grain Elevator Company tendered to the appellants, director of agriculture and *Attorney General,* a bond in the penal sum of fifty thousand dollars, executed by itself as principal and the Gallatin and Fisher companies as sureties. The named state officers, questioning the legal capacity of the sureties, refused to accept the bond as in compliance with the requirements of § 6996 [P. C. § 2659].

The complaint set forth the corporate organization of the sureties, their financial solvency, and their business and corporate interrelationship. It is alleged that the Fisher company owns and operates a large flouring mill in Seattle with a daily capacity of six thousand barrels of flour and cereals and fifteen hundred tons of feed. It sells its flour and grain products in many parts of the United States and foreign countries. Different types of flour are made, requiring different types of wheat and other grains.

As a consequence, the mill must have available to it, at its source of supply, a sufficient quantity of the quality, classes, and types required to supply current orders, and it is, therefore, essential for the mill to be able, from time to time, to purchase, at the sources of production, sufficient wheat of the various kinds to supply its needs; that an available supply of grain can be satisfactorily obtained by a flouring mill only through the operation of a chain of grain warehouses in wheat areas, either by itself or affiliated organizations; that, while the other large flouring mills oper-

ated in the Pacific northwest have their own warehouse systems, the Fisher company purchases its supplies from farmers storing wheat in the warehouses of the Milwaukee company. These sales are negotiated by the agents of the Milwaukee company through Mr. S. C. Armstrong, president of the company, who is also head of the grain department of the Fisher Flouring Mills Company and buys all the wheat required by it. The Milwaukee company is able to furnish other additional services not procurable through any other means or agency.

The purpose of these allegations was to establish such an interest in the operations of the Milwaukee company as would furnish a legal basis for the signing of its bond by the Fisher and Gallatin companies.

The respondent attached to its complaint, as an exhibit, a letter from the department of agriculture, signed by J. D. Fink, assistant director, and reading as follows:

"With reference to the question of this Department accepting grain warehousemen's bonds, written by corporations other than surety companies authorized to do such business in this State, we are today in receipt of a communication from the Attorney General, dated June 10th, 1935, which reads in part as follows:

" ' . . . we have not withdrawn our opinion to you under date of December 28, 1934, in substance holding that ordinary corporations should not be accepted and approved as surety on grain warehousemans' bonds.

" 'We do not regard the recent opinion of the superior court of Thurston County in the case of Milwaukee Grain Elevator Co. v. Robinson, as overruling or setting aside the above mentioned opinion.'

"In compliance with this opinion of the Attorney General we now formerly notify you that grain warehouse licenses will not be issued by this Department

for the year beginning July 1st next unless and until surety bonds are submitted which conform to this opinion.''

A demurrer interposed by the appellants having been overruled, an answer was filed in which they alleged that, when the bond was first tendered to the director of agriculture, it was disproved for the reason that, in the opinion of the *Attorney General,* corporations such as the sureties here were not eligible to act as surety on warehousemen's bonds, since they are not admitted and qualified to do fidelity and surety business, as required by the laws of the state of Washington; that, in disproving the bond, the defendants considered only lack of eligibility and did not exercise their discretionary power to pass upon such matters as financial responsibility or the power of the corporations to enter into the surety contract involved in the bond; that, since the overruling of the demurrer, defendants had considered the qualifications of the corporate sureties and the question whether or not they had power to execute a bond as surety and had determined that the contract of surety in controversy was not necessary to enable either of the corporate sureties to accomplish the objects for which they were created, nor reasonably necessary or proper to the conduct of their business, and, therefore, that neither of them is authorized to act as surety on the bond.

The defendants further stated that they were of the opinion, from their investigation of the facts, that the bond tendered, with the corporate sureties thereon, would not be in compliance with the law requiring the bond, for the reason that the interlocking character of the principal and corporate sureties would not provide the character or degree of protection to the state or to the persons interested which was contemplated by Rem. 1935 Sup., § 6996 [P. C. § 2659], and that they

believed, from an investigation of the law and the facts, that the bond as tendered, with the corporate sureties thereon, would not constitute a compliance with the section.

They further averred that, while they were satisfied with the financial ability of the corporate sureties named in the bond to pay the amount stated therein, they were not required, as officers of the state of Washington, to investigate or pass upon or approve any warehouse bond other than one executed by personal sureties or a duly admitted and authorized fidelity and surety company; and that to require them, as such officers, to pass upon the incidental interest of a surety in the business and affairs of the principal, is without the intent of the law imposing the duty of approving or disapproving warehousemen's bonds and the surety thereon; and that to do so would place an undue burden upon the defendants as state officers, not in contemplation of law and against the public policy of the state. No reply was filed to this answer.

Of the answer, it may be said that, in the main, it consisted of conclusions of law, rather than averments of fact, and raised no issues additional to those involved in the complaint.

While the exhaustive briefs filed by the parties, cover a wide range, the issue decisive of the case, as we view it, may be confined within a narrow compass. It is whether the warehousemen's act requires the surety to be a surety company authorized to do business as such in the state.

Under § 6996 [P. C. § 2659], the warehouseman is required to give a bond to the state, with "surety" to be approved, etc. This expression in the section, standing alone, is ambiguous and differs from the language generally employed in the numerous other statutes providing for statutory bonds.

█ In determining the meaning of a doubtful or ambiguous word or expression in an act, we may look to other portions of the act for aid.

"Obviously, in order that effect may be given to every part of an act in accordance with the legislative intent, all the language of the act must be considered and brought into accord. It is not safe to base a construction upon a particular word or phrase, for the language of legislative enactments is not always precise and accurate, and, besides, one portion may frequently be designed to extend, qualify or limit another, that the meaning of one portion of a statute may depend upon the effect of another. . . . The several provisions of the statute should be construed together in the light of the general purpose and object of the act and so as to give effect to the main intent and purpose of the legislature as therein expressed." 25 R. C. L. 1006.

█ Turning to the act with this rule in mind, we find in Rem. Rev. Stat., § 6980 [P. C. § 2644], a provision for the appointment of a chief inspector, who is required to give a "surety company bond" to the state of Washington. Section 6981 [P. C. § 2645] provides for the appointment by the chief inspector of deputy inspectors and bookkeepers, who are to give a "surety company bond." The bonds required under both sections are subject to approval by the public service commission [now director of agriculture] and the *Attorney General.* Section 6982 [P. C. § 2646] provides for the filing with the secretary of state of all bonds taken under the act, and for a right of action by anyone suffering from the failure of a bonded employee or warehouseman to comply with the provisions of the act, with the proviso:

"That the liability of *the surety* upon the bond required *to* be given by warehousemen as provided in section 6996 of this act shall be limited to the amount specified in the bond. . . . " (Italics ours.)

Rem. 1935 Sup., § 7000-1 [P. C. § 2663-1] provides, in case of any default on the part of the warehouseman, for giving notice forthwith, "in writing by mail, and by telegraph or telephone, to *the surety* on the bond required in section 6996 of this act."

Looking into the legislative history of the regulation of warehouses for the storage of grain, we find that the first comprehensive regulatory act was passed by the 1909 session, chapter 137, Laws of 1909, p. 519. The act provided that the railroad commission should have general supervision over such warehouses, which were required to procure, from the commission, annual licenses. The act did not require a bond from the warehousemen, although grain inspectors provided for were required to give a "surety bond," costs to be paid by the state.

At the 1911 session, a new and more comprehensive act was passed, chapter 91, Laws of 1911, p. 398, requiring, for the first time, that warehousemen give a bond, with "good and sufficient surety," as the commission might require. The inspectors were required to give a "bond," costs to be paid by the state. In 1919, another comprehensive law was passed repealing the former law. The new law, Laws of 1919, p. 598, § 18, Rem. Comp. Stat., § 6996, required warehousemen to give a surety bond. This section was revised in 1923 (Laws of 1923, p. 330, § 1) but retained the requirement for a surety bond.

In 1931, the section was again revised (Laws of 1931, p. 149, § 3, Rem. Rev. Stat., § 6996) to provide a formula for determining the amount of the bond required, that is to say, in a sum equal to five cents per bushel of the grain capacity of a single warehouse, and at the rate of ten cents per bushel of the grain capacity for bonds covering a group of warehouses. In the revised section, the word "surety" is used,

rather than the phrase "surety bond" employed in the prior act. The section was again revised in 1933, the only literal change being in the provision for determining the amount of the bond to be given by a warehouseman operating a group of warehouses, the rate being fixed on the basis of five cents per bushel instead of ten.

It will thus be seen that, from 1919 to 1931, there had been a consistent specific requirement for a surety company bond. If it had been the intent of the legislature in the 1931 act to depart from its prior policy, it is reasonable to suppose that it would have indicated this purpose in explicit terms. It is a fair inference from the whole, that the language employed in the amending act of 1931 accepted as understood the character of surety required. That this is so, is indicated by the use of the language we have quoted from the revised § 7000-1 [P. C. § 2663-1], providing for notice, in case of default, to "the surety on the bond required by section 6996," similar to the language employed in unamended § 6982 of the prior law, referring to the liability of "the surety upon the bond required to be given by warehousemen as provided in section 6996." Throughout, the singular, "surety," rather than the plural, "sureties," is employed.

The respondent strongly urges that a construction of the act requiring the execution of the bond by a surety company, would be anti-social and in violation of fundamental constitutional provisions, citing and quoting from *State ex rel. McKell v. Robins,* 71 Ohio 273, 73 N. E. 470, 69 L. R. A. 427. In that case, the court held a statute unconstitutional which made the execution of bonds by surety companies exclusive and compulsory. But this court has, in *Ferguson-Hendrix Co. v. Fidelity & Deposit Co.,* 79

Wash. 528, 140 Pac. 700, and in *State v. Bowen & Co.,* 86 Wash. 23, 149 Pac. 330, Ann. Cas. 1917B 625, explicitly repudiated the doctrine of the Ohio case.

In *Ferguson-Hendrix Co. v. Fidelity & Deposit Co., supra,* the court had under consideration chapter 139, Laws of 1907, p. 266, providing for the regulation of commission merchants, and requiring the giving of a bond to the state, executed by a surety company authorized to do business in the state. The constitutionality of this requirement was challenged, and in passing upon the question, the court, referring to *State ex rel. McKell v. Robins, supra,* said:

"It was further remarked that it was evident to the court that it would be more economical for the public to become its own insurer of the good faith of its officials, which would result perhaps in no official bond in any case. We had supposed that, under the constitution, the question as to whether the public welfare justified or required the state to exert its police power was a legislative question, and that ordinarily courts would not thwart the legislative will if any reason existed or could be suggested for the exercise of the power. It is certain that personal sureties have frequently failed to respond to their obligations, and we must assume that the legislature knew this fact and considered that the character of the bond under review would afford a safer, and hence a better, security to those who would be its beneficiaries. It would seem that the power to exact the security includes the right to determine the character and sufficiency of the security; that the greater power includes the lesser power."

In *State v. Bowen & Co., supra,* where this same question was again raised, the court said:

"Appellant insists that the requirement of the law, in order to obtain a license, that a surety company bond in the sum of $3,000 be furnished, is an unreasonable and invalid requirement. It insists also that it is impossible of performance. The last contention

is undoubtedly merely a conclusion or statement of opinion. We have heretofore held, in the case of *Ferguson-Hendrix Co. v. Fidelity & Deposit Co.,* 79 Wash. 528, 140 Pac. 700, that the provision of the law requiring such bond in order to obtain a license is a valid exercise of the police power of the state. It is urged, however, that that question was not involved and was not proper to be decided in that case. *State ex rel. McKell v. Robins,* 71 Ohio St. 273, 73 N. E. 470, 69 L. R. A. 427, where a similar statute in Ohio was not sustained, is cited in support of appellant's contention. We cannot give our assent to the reasoning or the conclusion in that case; and while it may be true that the validity of this section of the law was not involved in the *Ferguson-Hendrix* case, *supra,* yet we adopt the reasoning in that case as supporting this provision of the law.''

In *Ferguson-Hendrix Co. v. Fidelity & Deposit Co., supra,* Judge Gose suggested the considerations of public policy which warranted the legislative requirement of surety company bonds. The present case illustrates the wisdom of a legislative limitation upon the discretion of the state officers in respect of sureties permissible on the bond here in question.

It is likely that the financial responsibility of the sureties here involved is as adequate as that of any surety company that would execute the bond. But while this may be so in the present case, it might not be so in another; and if the right of the officials be conceded here, it could not be denied in some other case where a holding company, not having the financial worth of the Fisher and Gallatin companies, might demand the right to execute a bond for its subsidiary. The contention of the respondent would, of necessity, lodge a large measure of discretion in the state departments, and while they might in a case like the present be required to approve the bond where the surety is adequate, there would be no redress where,

in the exercise of discretion, an inadequate surety was accepted.

We must have in mind that the purpose of this law is to protect the producers, who entrust their grain to the safekeeping of bonded warehouses, and the further fact that negotiable warehouse receipts are issued, implying upon their face a guaranty that the wheat represented by them is actually on hand in the warehouse.

We have seen that the act requires the chief grain inspector and his deputies to supply a surety company bond. These bonds are taken primarily for the protection of the state. We cannot impute to the legislature less concern for the protection of the grain growers, or the purchaser of warehouse receipts, who is invited to accept them at face value. We conclude that it is the intent of the warehousemen's act that the bond required to be given by § 6996 is to be executed by a bonding company as surety.

The judgment of the trial court is, therefore, reversed, and the case remanded with direction to dismiss.

MILLARD, C. J., and MAIN, J., concur.

TOLMAN and HOLCOMB, JJ., concur in the result.

BLAKE, J. (concurring)—I concur in the result for two reasons: (1) For all practical purposes, the bond presented was not executed by sureties at all, since Fisher Flouring Mills Company is in effect the owner of, and in fact controls, the warehouse companies. There is such an identity of interest among the three companies that the corporate identities should be disregarded. (2) In any event, where a bond is executed by a corporation, as surety, when it has no specific power to act as such, it certainly is not incumbent upon the officers of the state to ascertain whether the

bond is good, on the theory that it is executed in furtherance of the corporation's business. The rejection of a bond executed by such a corporation as surety is within the discretionary powers vested in the director of agriculture and the *Attorney General*.

BEALS, J., concurs with BLAKE, J.

STEINERT, J. (dissenting)—In giving my reasons for dissenting, I shall proceed upon the assumptions contained in the majority opinion with reference to the facts in the case. In the ultimate, the facts are as follows: Fisher Flouring Mills Company does a large flouring mill business throughout the United States. The extent of its business territory requires it to make different types of flour, which, consequently, require different types of wheat and other grains. In order, therefore, that the company may have available at all times a sufficient quantity of the necessary types, grades, and qualities of desired grains, it is essential that it operate, or co-operate with, a chain of warehouses in the wheat areas. It was for that purpose that the relator, Milwaukee Grain Elevator Company, was organized and the surety bond here in question subsequently given. The financial responsibility of the two sureties is admitted by the state authorities and is conceded in the majority opinion.

I. At common law, a private corporation had the power to act as surety, whether expressly authorized so to do or not, if the exercise of such power was reasonably necessary or proper in the conduct of its business. *Wheeler, Osgood & Co. v. Everett Land Co.*, 14 Wash. 630, 45 Pac. 316; *Woods Lumber Co. v. Moore*, 183 Cal. 497, 191 Pac. 905, 11 A. L. R. 549; *Mercantile Trust Co. v. Kiser & Co.*, 91 Ga. 636, 18 S. E. 358; *Central Lumber Co. v. Kelter*, 201 Ill. 503, 66 N. E. 543; *Kraft v. West Side Brewery Co.*, 219

Ill. 205, 76 N. E. 372; *Winterfield v. Cream City Brewing Co.*, 96 Wis. 239, 71 N. W. 101; VI Fletcher Cyc. of Law of Private Corporations (Permanent Edition), p. 379 *et seq.*, §§ 2591, 2592.

In the *Wheeler, Osgood & Co.* case, there was involved a lumber company which was empowered by its charter to carry on the manufacture and sale of lumber in various forms and to do anything and all kinds of business that corporations were permitted to do by the laws of this state. It was held in that case that such corporation was authorized to become surety upon the bond of a contractor to whom it furnished building material, when such was the custom of manufacturers of lumber in the same locality. The court said:

"Much of the business of the country is done by corporations and it would be contrary to a sound public policy to impose limitations upon them in the control of their affairs not clearly imposed by statute or their articles of incorporation. Such being the custom, and it having been necessary for appellant to conform thereto to sell the material, we think it had authority to become surety under the provision aforesaid, authorizing it to carry on the manufacture and sale of lumber and everything connected therewith and to do anything and all kinds of business allowed to corporations, as provided for under the laws of the territory. It thereby asserted to itself the right to do all kinds of business connected with the manufacture and sale of lumber, and to do every and all kinds of business allowed to corporations under the laws of the territory, using the most general language under the apparent desire and intention expressed to the public that it should not be hampered and restricted in any way in the conduct of its affairs. . . . In construing the powers of corporations the tendency is toward a more liberal interpretation than formerly, and in holding that appellant had authority to execute this bond under the circumstances we are but following several prior decisions of this court

(*Tootle v. First National Bank,* 6 Wash. 183, 33 Pac. 345; *Allen v. Olympia Light and Power Co.,* 13 Wash. 307, 43 Pac. 55), and are sustained by a number of cases cited by respondent from other states.''

II. This power at common law extends to the execution of statutory bonds, under the same conditions, unless there is some statutory prohibition. *Horst v. Lewis,* 71 Neb. 365, 98 N. W. 1046, 103 N. W. 460; *Munoz v. Brassel,* 108 S. W. (Tex. Civ. App.) 417; *Sturdevant Bros. & Co. v. Farmers & Merchants Bank,* 69 Neb. 220, 95 N. W. 819; *Best Brewing Co. v. Klassen,* 185 Ill. 37, 57 N. E. 20, 76 Am. St. 26, 50 L. R. A. 765.

In the *Horst* case, *supra,* a brewing corporation had executed a statutory surety bond on behalf of a liquor dealer who was a tenant of the corporation and handled its products. The court, in holding that the brewing company had the power to become surety and was eligible as such, said:

''We take it that there is no better settled principle of law, in this country, than that a grant of express powers includes within it implied authority to do any and all things necessary and convenient for the carrying of them into execution. In order that the company shall obtain revenues from its buildings, 'in connection with its business,' it must have tenants engaged in vending its products; and, in order that a tenant shall so engage, it is indispensable that he have a local license under the statute, and he can procure such a license only by giving a bond like that in suit. The procuring of the bond is the initial and an indispensable step towards procuring a tenant for the company's property and a customer for its beer, and is, we think, clearly within its charter powers.''

III. The statutes of this state do not prohibit private corporations from executing such bonds. It is upon this phase of the case that the majority opinion seems to rest its conclusions.

Rem. 1935 Sup., § 6996 [P. C. § 2659], which is the section under which the state withheld its approval of the bond, reads as follows, in so far as it is material here:

"Each person, firm, corporation . . . operating any public warehouse . . . shall . . . give a bond to the state of Washington with surety to be approved by the director of agriculture . . . and the attorney general, conditioned upon the faithful performance of the duty to keep in such warehouse for the holder of any warehouse receipt the commodity described in such receipt. . . ."

The phrase "a bond to the state, with surety to be approved," contains the language calling for construction.

The majority opinion prefaces its analysis and interpretation of this section with the statement that this phrase is ambiguous, requiring the examination of, and comparison with, other sections of the statute. The majority then appear to base their conclusions upon four considerations: (1) the light afforded by Rem. Rev. Stat., §§ 6980, 6981 [P. C. §§ 2644, 2645]; (2) the fact that Rem. Rev. Stat., § 6982 [P. C. § 2646], and Rem. 1935 Sup., § 7000-1 [P. C. § 2663-1], which deal with actions and proceedings on surety bonds, refer to *the* surety on the bond, from which it is deduced that the statute had reference to only *one* surety, rather than to two or more, and that, therefore, a *surety company* bond was intended to be required; (3) that the legislative history of the regulation of warehouses for the storage of grain indicates that Rem. 1935 Sup., § 6996 [P. C. § 2659], was intended to require *surety company bonds;* and (4) the practical necessity of such construction.

Taking up the first argument advanced by the majority, it is to be observed that Rem. Rev. Stat.,

§§ 6980 and 6981 [P. C. §§ 2644, 2645], refer to bonds to be executed by the chief inspector and his subordinates. These officials are specifically required "to give a surety company bond," to be approved by the commission and the *Attorney General.* Warehousemen, however, under Rem. 1935 Sup., § 6996 [P. C. § 2659], are merely required to "give *a* bond to the state of Washington with surety to be approved" by the director of agriculture and the *Attorney General.* Nothing whatever is said about a surety company bond in Rem. 1935 Sup., § 6996 [P. C. § 2659].

The majority argue that, if the legislature, by express language, designated surety company bonds in the first two of these sections, it must have intended to require the same kind of bond in the last section, although it is not so expressed. The answer to this line of reasoning is that, if the legislature deliberately uses particular language in two sections, expressive of its intent, the use of different language in a third section evidences a different intent in that respect. These three sections were all originally part of the same act (Laws of 1919, pp. 590-598). The act was drafted by skillful hands and clearly shows that a distinction was intended.

The second argument lays emphasis on the word "the," in connection with the word "surety," used in Rem. Rev. Stat., § 6982 [P. C. § 2646], and Rem. 1935 Sup., § 7000-1 [P. C. § 2663-1], as showing that the bond was to be executed by a single surety and, therefore, by a surety company. In the first place, the appellants themselves attach no importance and lay no emphasis on the article "the," as used in these two sections. But apart from that, I think that the majority have labored the statute to yield a forced construction resting upon an insignificant word. The

phrase, "a bond with surety approved," which is the heart of Rem. 1935 Sup., § 6996 [P. C. § 2659], has reference, not merely to personal status, but to adequacy of protection and security as well. Moreover, the word "surety" is used in a collective, and not in an individual, sense. Had the legislature intended to convey any such refined meaning as the majority contend for, it naturally would have, as it easily could have, done so in one of two ways, either by expressly providing for the requirement of a *surety company* bond or else by requiring bond with *a* surety, thereby indicating singularity of suretyship.

The third argument proceeds upon the legislative history of Rem. 1935 Sup., § 6996 [P. C. § 2659]. I am wholly unable to comprehend the court's reasoning on this phase of the matter. The opinion first points out that, prior to 1911, the statute did not require warehousemen to give any bond at all. Then, it is shown that, under the law enacted in 1911 (Laws of 1911, chapter 91, p. 398 [407]), a new and more comprehensive act was passed, requiring, for the first time, that warehousemen give a bond, with "good and sufficient surety," as the commission might require. In 1919, another comprehensive law was passed (chapter 189, Laws of 1919, p. 589 *et seq.*) repealing the 1911 act. Under § 18 (Rem. Comp. Stat., § 6996) of the 1919 act, p. 598, warehousemen were required to give "a surety bond," to be approved by the commission and the *Attorney General*. Then, in 1923, the law was once more revised (Laws of 1923, p. 330, § 1), but the same language, "a surety bond," was retained. Again, in 1931 (Laws of 1931, p. 149, § 3, Rem. Rev. Stat., § 6996), the law was revised to read "a bond to the state of Washington with surety approved." From these premises, the court draws this surprising conclusion:

"It will thus be seen that, from 1919 to 1931, there had been a consistent specific requirement for a *surety company bond.*" (Italics mine.)

This conclusion is a paralogism. There was no specific, nor any, requirement in any of these sections of the statute for a *surety company* bond. In this language, the majority opinion assumes the fact that is in dispute and then establishes its conclusion upon the fact thus assumed. This is simply a begging of the question. The fact still remains that the legislature has never provided that a warehouseman shall give a *surety company* bond, but only a *surety bond.* There is no rule that, nor any reason why, a surety bond can be executed only by a surety *company.*

The majority finally rest their conclusion upon the argument that the construction given by them to the statute is necessary, because, otherwise, in certain cases, the state might approve bonds where the surety is inadequate. The argument advanced by the majority would be persuasive if it were not for the fact, frankly conceded, that the financial responsibility of the sureties in this case is adequate. I concede that, if there were any question of adequacy, then it would be within the discretion of the state officials to disapprove the bond. That is the very reason for clothing them with discretion. But in the absence of any such question, and in the face of an admission that the bond is adequate, it is an arbitrary exercise of power not to approve it.

Being unable to agree with the majority, I dissent.

MITCHELL, J., concurs with STEINERT, J.